[Civ. No. 5789. Second Appellate District, Division One.—March 12, 1928.]

RIPLEY IMPROVEMENT COMPANY (a Corporation), Respondent, v. HELLMAN COMMERCIAL TRUST & SAVINGS BANK et al., Appellants.

Page & Hurt and Arthur F. Coe for Appellants.

Tanner, Odell & Taft for Respondent.

HAHN, J., *pro tem.*—The action which gives rise to this appeal is one wherein plaintiff, formerly Blythe Construction Company, sought to enjoin the sale of certain lands held under trust deeds as security for the payment of two promissory notes, one for the sum of $10,000 and one for $15,000, executed by plaintiff to the defendant Peoples Trust & Savings Bank of Riverside. Subsequent to the filing of the suit the $10,000 note was disposed of and the case went to trial upon the $15,000 note and the property described in the trust deed securing it. This note was dated August 14, 1918, and made payable three years after date. Judgment was rendered in favor of plaintiff, enjoining the sale of the property described in the trust deed securing said note and also canceling the said note on the ground that the same had been fully satisfied and paid. Defendants appeal.

The following statement as to the material matters bearing on the issues involved is fully and fairly supported by the evidence as it appears in the record in the case.

Prior to August 14, 1918, plaintiff had become indebted to the defendant Peoples Trust & Savings Bank, a banking institution located in the city of Riverside, California, in the sum of $45,000, and as security for the payment of this indebtedness plaintiff executed a trust deed covering a 1500-acre tract of land in Riverside County. As additional security for the payment of this indebtedness, plaintiff pledged with the said Peoples Bank 38 bonds of the California Southern Railroad Company of the par value of $1,000 each. On August 14, 1918, plaintiff, having reduced this indebtedness to $25,000, arranged with the Peoples Bank for a cancellation of the $45,000 note upon the execution by it of two new notes, one for $10,000 and one for $15,000, the latter being the only one involved in the controversy. This note was secured by a trust deed covering a portion of the 1500-acre tract which had been held as security by the bank with the $45,000 note. In arranging for the execution of the new notes, it was agreed between plaintiff and the Peoples Bank that the $38,000 in bonds would be released and returned to the plaintiff corporation. The old note was canceled and a reconveyance of the property made to plain-

tiff upon the execution of the new notes and trust deeds, but for some reason the bonds were neither delivered by the Peoples Bank to plaintiff nor demanded by the plaintiff. Plaintiff at that time was conducting its banking business with the Peoples Bank and, as testified to by its president, felt that the bonds were safe in the bank's possession.

In July, 1919, the Peoples Bank, being indebted to the defendant Hellman Trust & Savings Bank in the sum of $41,500, which indebtedness was in fact evidenced by notes executed by Florence Hoxie and Flora Odell admitted dummies for the Peoples Bank, deposited with the Hellman Bank as security for the aforementioned indebtedness, the $38,000 of bonds belonging to the plaintiff company. This use of the bonds by the Peoples Bank was without the consent or knowledge of the plaintiff. Nor was the Hellman Bank aware that the bonds belonged to the plaintiff or that the Peoples Bank had no right to hypothecate them. Not until July, 1921, did plaintiff discover that the bonds were held by the Hellman Bank as security for an obligation of the Peoples Bank. Immediately following this discovery, A. E. Warmington, the president at that time of the plaintiff company, took the matter up with the vice-president of the Hellman Bank and also with the president of the Peoples Bank. Without any authority from the board of directors of the company, Warmington wrote a letter to the Hellman Bank at the request of its vice-president, which reads as follows:

"December 24, 1920.
"Hellman Commercial Trust & Savings Bank,
    "Los Angeles, Cal.
        "Attention Mr. Emanuel Cohen, Vice President.
"Gentlemen:
    "Some time ago we deposited with the Peoples Trust & Savings Bank at Riverside, Nos. 166 to 200 both inclusive and Nos. 241 to 243, both inclusive, Class B Bonds of the California Southern Railroad Company, having a par value of $1000 each and a total par value of $38,000, as partial security for advances made to us by the Bank.

    "Although this obligation has been paid in full the bonds were not returned to us, but on the contrary we are informed

that these bonds have been pledged to you as security for loans as follows:

"Thirty (30) of said Bonds attached as collateral to a note executed by Florence O. Hoxie under date of July 31, 1919, and

"Eight (8) of said Bonds attached as collateral to a note executed by Flora L. Odell under date of July 31, 1919.

"These debts have been acknowledged as due and owing by the Peoples Trust & Savings Bank, said Bank by resolution guaranteeing the payment of aforesaid notes at a regular meeting of the Board of Directors of said bank, held on November 8th, 1920, a certified copy of which is in our hands, therefore, in view of such guarantee, you are advised that we are now willing and do hereby consent that these bonds remain with you as a pledge securing said notes.

"Very sincerely,

"BLYTHE CONSTRUCTION COMPANY.

"A. E. WARMINGTON, President."

Some time prior to the discovery by the plaintiff company that its bonds had been unlawfully deposited with the Hellman Bank, the plaintiff had executed an option giving to the Santa Fe Land Improvement Company the right to purchase the bonds in question. On November 14, 1921, the Santa Fe Land Improvement Company demanded the bonds, and as they were still in the possession of the Hellman Bank, plaintiff found it necessary to pay to the Hellman Bank the sum of $38,000, in order to secure these bonds. It appears from the complaint and findings that the selling price of the bonds was in excess of their par value.

In May, 1920, at a time subsequent to the execution of the note and mortgage herein involved, and prior to the discovery by the plaintiff that its bonds had been unlawfully deposited with the Hellman Bank, the Peoples Trust & Savings Bank became financially involved. With the consent of the state banking department, and in conformity with the provisions of section 31 of the California State Bank Act (Stats. 1909, p. 95), the Peoples Bank in effect made an assignment to the Hellman Trust & Savings Bank. This arrangement was evidenced by two contracts, one dated May 21st and the other dated May 22d, 1920. One of the agreements provides for the sale and assignment by the

Peoples Bank to the Hellman Bank of what might be termed its good paper and securities, the same to be selected by the state superintendent of banks from the assets of the Peoples Bank. The total of the face value of the notes and securities so selected was not to exceed the total amount of the deposit liabilities of the commercial department and savings department of the Peoples Bank. The Hellman Bank on its part agreed to pay all of the deposit liabilities of the Peoples Bank. It was further agreed that the remaining assets of the Peoples Bank aside from the securities deposited with the state treasurer to guarantee the faithful performance of the trust department, were to be assigned and transferred to two trustees, one selected by the Peoples Bank and one selected by the Hellman Bank. These assets, characterized as ''rejected assets,'' were to be held and used to recoup the Hellman Bank for any losses it sustained within one year from the date of the assignment in any of the securities or notes which were directly transferred to it upon selection by the superintendent of banks. It was also provided that all securities deposited with the state treasurer were to be available to recoup any losses suffered in the securities directly transferred to the Hellman Bank. The arrangement contemplated the transfer by the Peoples Bank of its lease on its banking-room to the Hellman Bank, and that the Hellman Bank would establish one of its branches in the banking quarters for the purpose of continuing the banking business. The ultimate end contemplated was the liquidation of the Peoples Bank. Pending the liquidation, the Peoples Bank continued to occupy quarters in the same banking-room with the Hellman Bank. The contract further provided that upon the expiration of one year from the date of the agreement, all of the surplus assets left in the hands of the trustees as well as such as were on deposit with the state treasurer were to be transferred back to the Peoples Bank.

The $15,000 note and trust deed herein involved were included in the list of securities selected by the superintendent of banks and transferred directly to the Hellman Bank. Subsequent to this transfer, at the request of the Peoples Bank, plaintiff consented to the substitution of the Hellman Bank as trustee in the trust deed instead and place of the Peoples Bank. It may explain in part at least the

conduct of plaintiff after learning of the misuse of its bonds, to note that the president of the company testified that it was his understanding that all of the transactions between the two banks involved simply an arrangement for the Hellman Bank to act as trustee for the Peoples Bank in accomplishing its liquidation, and upon this belief, plaintiff made all interest payments and one payment of $1,000 on account of the principal of said note with checks drawn in favor of the Peoples Trust & Savings Bank.

It may also be noted at this point that according to his testimony, the president of the plaintiff company was induced to write the letter of December 24, 1920, to the Hellman Bank by the representations made by the president of the Peoples Bank and a vice-president of the Hellman Bank that the assets of the Peoples Bank available for payment of its obligations was considerably in excess of its liabilities, and that in the liquidation of the bank's affairs the Hellman Bank would be paid the $41,500 then owing to it as a balance of the amount for which the bonds were pledged; and that thereupon the bonds would be delivered over to the plaintiff. It does not appear that any of the other officers or directors of the plaintiff corporation consented to or had knowledge of the writing of this letter by Warmington, its president.

Unfortunately, the affairs of the insolvent bank did not turn out as the parties anticipated. The plaintiff company, finding it necessary to secure the bonds before the claim of the Hellman Bank had been paid, concluded that their best course under the circumstances was to pay to the Hellman Bank the $38,000 par value of the bonds and thus secure them for delivery to the Santa Fe Land Company. Following this incident, plaintiff evidently awoke to a realization of its precarious position in relation to the bond matter and the trust deed note, and a controversy arose when the Hellman Bank endeavored to force payment of the balance of $14,000 due on the note. Plaintiff claimed that the Hellman Bank had unlawfully exacted from it the payment of $38,000 before delivering up the bonds, and out of that sum in the bank's possession it demanded that the note be satisfied and canceled. Upon the bank's refusal to meet plaintiff's demands, and in order to enjoin the bank's threat

to proceed with the foreclosure of the trust deed, plaintiff filed this action.

Appellants in their brief urge four points upon which they base their argument for a reversal of the judgment. These contentions are stated in the following language:

"1. The plaintiff has not the right to offset its claim against the effort of the Hellman Commercial Trust and Savings Bank to foreclose its trust deed, for the reason that under the authorities an unsecured claim cannot be set off against an effort to enforce a mortgage or trust deed, but can only be set off against an effort to collect a deficiency due after the foreclosure and sale have been made.

"2. The plaintiff cannot set off its claim against the effort of the Hellman Commercial Trust and Savings Bank to foreclose the trust deed for the reason that its claim arises out of an unliquidated cause of action arising in tort from the conversion of the plaintiff's bonds and cannot be set off against a contract claim under the laws of the state of California.

"3. The plaintiff cannot set off its claim against the effort of the Hellman Commercial Trust and Savings Bank to foreclose its trust deed, for the reason that the plaintiff's claim at the time the action was brought was barred by the statute of limitations, and it is settled by the decisons that a claim which is barred by the statute of limitations cannot be asserted as a set-off.

"4. The plaintiff cannot set off its claim as against the effort of the Hellman Commercial Trust and Savings Bank to foreclose its trust deed, for the reason that by its conduct it has lulled the Hellman Commercial Trust and Savings Bank into a sense of security and has caused a loss to the Hellman Commercial Trust and Savings Bank which the Hellman Bank could have avoided if it had been notified of the claim of the plaintiff."

Under the first two points, appellants urge that plaintiff's claim is not one that may be properly set up as a counterclaim in an action or proceeding to foreclose the trust deed and therefore such a claim would not be available to enable the plaintiff in the instant case to enjoin the foreclosure of the trust deed. This is urged upon the theory that while plaintiff may have a right of action arising out of the con-

version of the bonds, it is not such an action as would constitute a cross-demand under section 440, of the Code of Civil Procedure. In support of this view, appellants cite *McKean* v. *German-American Savings Bank*, 118 Cal. 334 [50 Pac. 656], and *Moore* v. *Gould*, 151 Cal. 723, 731 [91 Pac. 616]. In addition appellants urge that plaintiff's claim cannot be set up as a counterclaim under section 438 of the Code of Civil Procedure, for if it be considered as a counterclaim, the statute of limitations has run against it.

█ Plaintiff's cause of action is not one for conversion, but rather for money had and received. Neither the allegations of the complaint nor the prayer look to a recovery of the value of the bonds. The action is one in effect which seeks a return to the extent of $14,000 which the plaintiff claims it paid to defendant the Hellman Bank both by reason of duress and mistake of law. If the plaintiff is correct in its theory, it follows that the Hellman Bank had in its possession more than $14,000 belonging to plaintiff. The Hellman Bank being also a creditor of the plaintiff, plaintiff has a right to request and demand the application of its funds in the hands of the Hellman Bank to extinguish its obligation to it.

It is not contended by the appellants that the bonds in question at the time they were turned over to the Hellman Bank by the Peoples Bank were not the property of the plaintiff, or that when the Hellman Bank received them, it had a legal right to their possession. While it is urged that by reason of the letter written by the president of the plaintiff company to the Hellman Bank, the plaintiff is estopped from making claim to the bonds, we are of the opinion that at no time did the Hellman Bank have any right to retain the bonds in question and had no legal right to exact the payment of $38,000 from the plaintiff as a condition to delivery of the bonds to plaintiff. Hence it readily follows upon equitable considerations that at the time of the commencement of the instant case appellant Hellman Bank had in its possession belonging to the plaintiff in excess of $14,000, and which sum plaintiff had a legal right to demand should be credited upon its indebtedness to the Hellman Bank as evidenced by the trust deed note in question.

We find nothing in the decisions in the cases of *McKean* v. *German-American Savings Bank* and *Moore* v. *Gould*,

*supra,* that conflicts with this conclusion. The first of these cases deals with the question of the right of a bank to appropriate money on deposit belonging to a mortgagor, to the mortgage debt before recourse is had to the mortgage security; and the second holds that a mortgagor may not in an action to foreclose on a mortgage debt set up in his answer unliquidated claims for legal services. The right of the plaintiff to the redress prayed for upon the facts as they appear in the instant case so clearly applies to the considerations that control the equity side of the court that the citation of authorities seem unnecessary to support the contentions of respondent.

■ Under the third point, appellants urge that plaintiff's complaint is barred by the statute of limitations. This contention is based upon appellants' theory that the only action available for the plaintiff is one in conversion, and that the right of action began when the Peoples Bank failed to deliver the bonds when plaintiff executed the $10,000 and $15,000 notes in exchange for the old $45,000 note which was in part secured by the bonds. We do not deem it necessary to discuss the questions raised in the briefs of counsel as to when the right of action for conversion arose, for, as we have indicated, the allegations of the complaint clearly indicate the action is one for money had and received, and the findings support such a theory. We take it that it would be readily conceded by appellants that the statute had not run against the plaintiff to bring an action for money had and received.

■ In their fourth and last point appellants urge that upon the principle of estoppel respondent is not entitled to the relief prayed for in the complaint and granted by the judgment. In support of this contention it is pointed out that the president of the plaintiff corporation wrote the letter hereinbefore referred to and thus lulled appellant Hellman Bank into a sense of security until the year had elapsed within which under its contracts with the Peoples Bank it could recoup its losses that might be incurred in taking over the assets and paying the liabilities of the Peoples Bank.

The first answer to this contention is that the appellants did not properly raise the issue of estoppel in their answer. When estoppel is relied upon it must be properly pleaded.

(*Burk* v. *City of Santa Cruz*, 163 Cal. 807 [127 Pac. 154] ; *Frank* v. *Crescent Wharf etc. Co.*, 50 Cal. App. 272 [195 Pac. 97].) It is true there is a brief allegation in the answer alleging that plaintiff on December 24, 1920, wrote a letter to the defendant Hellman Bank stating that the defendant Peoples Bank had acknowledged its liability for the indebtedness to the Hellman Bank which was secured by the bonds in question, and that it was willing that the bonds should remain with the Hellman Bank as a pledge securing said indebtedness. This allegation does not begin to meet the requirements of a pleading raising the issue of estoppel. There is no allegation that there was either any consideration that passed to the plaintiff for such a letter, or that by reason of the writing of such a letter the Hellman Bank had in anywise been injured, or had been led or induced to waive any claim or advantage it had, or might have had against the Peoples Bank. In fact, the statement falls considerably short of what would be required to raise an issue of estoppel.

The second answer is that the letter in question was not the letter of the plaintiff corporation. It was written by the president of the corporation without any authority from the board of directors. Nor does it appear that any other officer or member of the board of directors had any knowledge of the writing of the letter or in any manner consented to it, or approved it, or ratified it.

Various other points and legal questions are raised in the briefs of both appellants and respondent, but we deem the points discussed as determinative of the case and hence a consideration of the other questions are unimportant.

For the foregoing reasons the judgment is affirmed.

Houser, Acting P. J., and York, J., concurred.