NORAH JOHNSON BARBOUR *vs.* A. SPALDING WELD & others.

Suffolk.   January 28, 29, 1909. — March 30, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & BRALEY, JJ.

*Contract*, Making, Rescission.   *Trust*, Termination, Removal of trustee.

Three women owning eighty-four out of the total of one hundred of the common shares of the capital stock of a corporation, one of whom held fifty-two shares, conveyed seventy-five of the shares to a trustee, to hold for three years, in order that he might negotiate the sale of preferred stock of the corporation, without voting power, the issuing of which had been authorized. The trustee was unsuccessful in disposing of the preferred stock, and was asked by the holder of the fifty-two shares to give up the trust. He stated that he would do so, if a writing requesting him to resign signed by all three of the women who had conveyed the shares to him was presented to him. Such a writing was prepared and was signed by all three of them and this was presented to the trustee, but before its presentation one of the signers telephoned to the trustee "to do nothing about the paper until he heard from her," and had written to him a note retracting her signature and stating that she had signed "under a misapprehension and a misrepresentation." It appeared afterwards that her signature had not been obtained by misrepresentation and that she had signed the writing with a full knowledge of the facts. In a suit in equity by the holder of the fifty-two shares of the stock praying for the termination of the trust, the plaintiff contended that she was entitled to a decree for the cancellation of the indenture of trust on the ground that there was a completed agreement of rescision. *Held*, that the trustee's offer to resign, if a writing requesting him to do so signed by the three shareholders was presented to him, never was accepted, one of the three signers having withdrawn her request before the writing was presented to the trustee, although physically she had not removed her signature.

In a suit in equity by a woman holding fifty-two out of the total of one hundred of the common shares of the capital stock of a corporation, seeking the cancellation of an indenture of trust by which she and her two sisters, holding together eighty-four common shares of the corporation, conveyed to the principal

defendant as trustee seventy-five of the shares, to hold for three years, in order that the principal defendant as such trustee, under a contract which he had made with the corporation, might negotiate the sale of preferred stock of the corporation, without voting power, it appeared that the defendant was unsuccessful in his attempt to sell the preferred stock and admitted his inability to do so, but that no action had been taken by the corporation or by the directors in its behalf rescinding its contract with the defendant, and that the plaintiff had discontinued her suit as against the corporation, which originally had been made a defendant, and did not seek to have the contract between the corporation and the principal defendant rescinded on the ground that that defendant had control of the corporation and that the directors or a majority of them were acting with him. It further appeared that the plaintiff's sisters did not join with her in asking for a cancellation of the indenture. By an amendment to her bill the plaintiff had added her two sisters as parties defendant and had alleged misconduct of the principal defendant as trustee and prayed for his removal. Upon this branch of the case it appeared that the defendant, by means of holding as trustee seventy-five out of the one hundred shares entitled to vote, had elected himself president and had continued himself in that office and had voted and caused to be paid to himself an unearned salary of $5,000 a year. *Held*, that there was no ground for the cancellation of the indenture of trust, even if the plaintiff's sisters had joined in asking for it, but that the plaintiff was entitled to a decree removing the principal defendant from his position of trustee for misuse of his control of the corporation, and ordering him to assign the shares held by him as trustee to their original owners; and that the fact that, the trust being a personal one, the incidental effect of the removal of the trustee would be to terminate it, was not inconsistent with the decision that there was no ground for cancelling the indenture of trust.

LORING, J. The facts of this suit set forth in the master's report are as follows:

On May 16, 1906, the Johnson Educator Food Company made an agreement with the defendant Weld whereby he was to advise that company as to " the best method to pursue [in getting more capital rendered necessary by increasing business], . . . also to float whatever preferred stock your company may see fit to issue "; and the company was to pay him therefor $5,000. This contract was entered into in behalf of the corporation by vote of its directors.

The Johnson Educator Food Company was a Massachusetts corporation with a capital stock of $10,000, divided into shares of $100 each, owned as follows: fifty-two shares by the plaintiff, sixteen shares by each of her two sisters, Mrs. Wiksell and Mrs. Hemman, and the other sixteen shares by one Gilman, who was then the treasurer of the corporation and the manager of its business.

At the annual meeting in July, Weld, the plaintiff's husband

and Mrs. Wiksell's husband were elected directors; Barbour was elected treasurer and Wiksell clerk. At the ensuing meeting of directors Weld was elected president.

In July, 1906, by Weld's advice, the capital was increased by $100,000 preferred stock. By the terms of the issue of these preferred shares the holders of them were not to have the right to vote as stockholders. No stock was sold. In October, four months later, Weld said the reason why he could not sell preferred shares was that the plaintiff, who had the control, was a woman. "He suggested that the stock should be put in trust. in order that the control should be in one person, not a woman,. and that permanency of management for a limited period should. thereby be assured, representing to the ladies that in such event. he would be able to sell preferred stock in accordance with the· terms of his letter of May 16." This was acceded to by the· plaintiff and her sisters, and they entered into an indenture of· trust under date of November 2, 1906, by which they made. Weld trustee of seventy-five of the one hundred shares, for three years. These seventy-five shares consisted of fifty shares contributed by the plaintiff, ten by Mrs. Wiksell, and fifteen by Mrs. Hemman, and these three women were the parties of the first part to that indenture. By the terms of the indenture the trustee was to have all the rights, powers and privileges of a trustee, with two limitations, to wit: (First) He was not to consent to sell the business of the corporation without the written consent "from all the parties of the first part"; and (second) he was "not to vote to remove the entire business of said corporation to other parts of this country."

In the following December (December, 1906), Weld sold seventy-five preferred shares and a third person sold five. Those eighty shares are all that have been sold. That is to say, eighty shares were sold and nine hundred and twenty shares have not been sold.

Nevertheless, between November, 1906, and February, 1907, Weld drew out the whole $5,000 which was to be paid to him for "floating whatever preferred stock" the company issued.

"In May, 1907, the plaintiff saw the defendant Weld with reference to the further sale of stock and expressed her dissatisfaction with the results already reached. The defendant Weld

told her in substance that he was unable to sell more stock unless the preferred stockholders were given the privilege of voting and unless the plaintiff would assent thereto he might as well give the matter up. The control of the stock had always been insisted upon by the plaintiff and her sisters and it was so understood by the defendant Weld when he took hold of the reorganization and accepted the trust. The plaintiff refused to accede to this proposition and in view of the defendant Weld's statement that he could then do no more, asked him to give up the trust. He stated that he would do so if a writing to that effect signed by all the sisters was brought to him, and that this was the first thing to be done."

Pursuant to this interview the plaintiff and her husband prepared a writing requesting Weld to resign and this was signed by Mrs. Barbour, Mrs. Wiksell and Mrs. Hemman. This was presented to Weld on the next morning, but before its presentation Mrs. Wiksell had telephoned to Weld "to do nothing about the paper until he heard from her," and had written him a note retracting her signature and stating that she signed " under a misapprehension and a misrepresentation." The master found that Mrs. Wiksell signed with a full knowledge of the facts known to the plaintiff and that her signature was not obtained by misrepresentation.

It appeared that Mrs. Hemman, at one of the hearings before the master, also withdrew her request that Weld should resign. The master found that the plaintiff and her sisters relied upon the spiritualistic method of treatment practised by one Mrs. Alden, " a clairvoyant physician," and that it was upon Mrs. Alden's suggestion that they had applied to Weld in the first instance. The master further found that Mrs. Wiksell's retraction of her signature to the writing requesting Weld to resign " was due to the spiritualistic influence which Mrs. Alden exercised over her, and that such influence was volunteered, uncalled for and unnecessary," but that " the evidence was insufficient to satisfy " him that "there was any conspiracy or agreement between Mrs. Alden and the defendant Weld which resulted in Mrs. Wiksell's recalling her request for revocation."

Weld refused to resign as trustee, and " he continues to act as president."

On July 3, 1907, Weld "voted with Mr. Wiksell, but against the objection of Mr. Barbour, that the corporation should pay him a salary of $5,000 a year to commence with January, 1907."

The master's report then continues as follows:

" The defendant Weld was appointed a director, president and trustee for the sole purpose of a reorganization and of financing the company. It was not the understanding of the stockholders that he was to manage the industrial end of the business which was under the control of a competent manager.

" He advised with his counsel as to new by-laws which should carry out his plans for reorganization. He made himself more or less familiar with the method of conducting the business and kept in touch therewith by visits to the store and by communication with the general manager. He introduced the treasurer to a bank and assisted in obtaining a loan therefrom for $15,000. He advised in reference to the purchase of a piece of real estate and as to advertising.

" These services were such as were to be expected under his contract with the company to enable him intelligently to place the stock and to put the company on a firmer business basis. They did not warrant a salary of $5,000 a year in addition to the compensation provided by the contract.

" His action in voting himself such a salary was contrary to the purpose for which he was made director and to the understanding of the parties whose stock elected him."

In addition to the above, the report contains the following supplementary findings:

" The consent of two of the parties beneficially interested in the property put in trust was voluntarily given to its revocation. One of said parties withdrew her consent before and the other one after such consent had been communicated to the trustee. Both of them withdrew their consent because of a mistaken idea upon their part, produced in the one by spiritualistic influence and in the other by ignorance, that such withdrawal was not for their best interests or the best interests of the company.

" The sole purpose of making the trust was to enable the defendant Weld to more readily sell preferred stock which did not have voting power. This purpose cannot be carried into effect by him and the trust is no longer necessary therefor. The con-

tinuance of the trust under the conditions stated is not for the best interests of the stockholders or the company.

" The preferred stockholders when they bought the stock and the bank from which the company borrowed money knew of the trust. None of the stockholders or the officers of the bank, however, testified and there was no evidence to show that they relied upon the trust, objected to its revocation, or would thereby be in any way injuriously affected."

This report was filed on January 22, 1908. Exceptions were taken by the defendant which came on for hearing before April 1, 1908. On April 1, 1908, a " memorandum " was filed overruling the exceptions, but refusing the relief sought for, to wit, the cancellation of the indenture of trust on the ground (first) that it was asked for by " one of the four parties to it against the objection of the others "; and (second) that no agreement for its termination " was ever consummated." It was suggested in this memorandum that it might be that enough was shown to warrant the removal of Weld as trustee, but if the plaintiff sought that relief the other beneficiaries of the trust ought to be made parties to the bill.

On June 16, 1908, the plaintiff was allowed to amend her bill by joining Mrs. Wiksell and Mrs. Hemman as parties defendant and by adding a new allegation of misconduct by Weld as trustee, and a prayer for his removal. Later Mrs. Wiksell and Mrs. Hemman appeared and filed answers objecting to the removal of Weld as trustee.

At some time before October 16, 1908, the suit came on for hearing on the merits. The plaintiff offered to put in the master's report as against the two new defendants. A long colloquy ensued which it is not necessary to state, as counsel for the new defendants and for Weld, at the argument at the bar of this court, consented that the suit should be disposed of finally on the master's report.

On October 16, 1908, a " memorandum " was filed, in these words :

" If, as already decided, the bill cannot be sustained for a revocation of the trust directly, I am not satisfied by any evidence introduced before me that the trustee should be removed, thus by indirection doing what the court has refused to do directly.

"Let a decree be entered dismissing the bill; said decree, however, to be without prejudice to any distinct and proper proceeding for the removal of the defendant Weld as president and director of said corporation."

Later, the cause coming on for final decree, the judge, at the request of the plaintiff and before the entry of the decree, reserved and reported the questions of law involved in an appeal taken from the order directed to be entered by the "memorandum" filed when the hearing was had on the original bill; and upon the questions of law involved in the hearing on the amended bill.

It should be added in explanation of the record before the court that the plaintiff discontinued as against the corporation, a party to the original bill before the suit went to the master. This does not appear on the record before us, but was stated by counsel to be the fact.

The first ground on which the plaintiff contends that she is entitled to a decree for cancellation of the indenture of trust is because there was a completed agreement of rescission. But that is not so. Weld's offer to resign never became an agreement. His offer was that he would resign "if a writing to that effect signed by all the sisters was brought to him." Before the writing was brought to him Mrs. Wiksell had notified him that she had in fact retracted her request, although she had not physically removed her signature. Under those circumstances Weld's offer to resign never was accepted.

Her next contention is that Weld has failed to perform his agreement with the corporation to sell the new preferred stock and has admitted his inability to do so; that the trust was to aid in selling the stock, and, since that admittedly cannot be done, the trust has come to an end as fully as if it had been performed. It is to be remembered in this connection that Weld's agreement was with the corporation, while the trust indenture was between the plaintiff and her two sisters "of one part" and Weld "of the other part." No action had been taken by the corporation, or by the directors in its behalf, rescinding the contract between the corporation and Weld. Nor has the plaintiff sought to have the contract between the corporation and Weld rescinded on the ground that Weld has control of the cor-

poration and that the directors or a majority of them are acting with him. That relief could not be given in this bill, if for no other reason, because the corporation is not now a party to it. *Tibballs* v. *Bidwell*, 1 Gray, 399. *Price* v. *Minot*, 107 Mass. 49. See also *Aberthaw Construction Co.* v. *Ransome*, 192 Mass. 434. What we are asked to do is to hold that the parties of the first part to the trust indenture have a right to have the indenture cancelled because the unrescinded contract between the corporation and Weld has virtually come to an end. In our opinion the parties of the first part are not entitled to have the indenture of trust cancelled under those circumstances. Since we are of opinion that there is no ground for the cancellation of the indenture it is not necessary to consider the difficulty raised by the fact that all the parties of the first part to that indenture have not joined in asking for its cancellation.

But we are of opinion that the defendant has so misconducted himself that he should be removed from the office of trustee.

In dealing with the removal of the trustee it is not necessary that all the parties of the first part to the indenture of trust should act together. On the contrary, in our opinion one of several beneficiaries can have a trustee removed if he has so misconducted himself that he ought to be removed.

That misconduct in the office of trustee is ground for removal is beyond question. See *Billings* v. *Billings*, 110 Mass. 225.

The difficulty in the way of giving relief which existed in *Lafferty's Estate*, 154 Penn. St. 430, does not exist here. The plaintiff as owner of a majority of the whole capital stock entitled to vote had a right to control the internal affairs of the corporation. Under those circumstances, at any rate, the rights of stockholders need not be considered. It is stated by the master that there was no evidence to show that persons who bought the few preferred shares which were sold or the bank which lent money to the corporation "relied upon the trust, objected to its revocation or would thereby be in any way injuriously affected." Their rights therefore do not stand in the way.

We do not agree with the view put forward in the second memorandum, namely, that if the bill cannot be sustained for a cancellation of the trust it cannot be sustained for a removal of

the trustee for that would do by indirection what cannot be done directly. The removal of the trustee and the cancellation of the trust are different things depending on different considerations. And in the ordinary case they lead to different results. In the ordinary case, on the removal of the trustee, a new trustee is appointed and the trust goes on. The trust in the case at bar is in our opinion a personal one. For that reason if the trustee is removed the trust will come to an end. But there is nothing inconsistent in holding that there is no ground for cancelling the indenture of trust and at the same time holding that Weld should be removed for misconduct. It happens that the trust, being a personal one, will come to an end when Weld is removed. But that is an accident.

It has been contended that Weld's misconduct was as president and director and not as trustee. It is true, as stated by the learned counsel for the defendant, that Weld was originally elected a director by vote of the plaintiff, and that it was as director and president that he assumed control of the industrial end of the business and voted an unearned salary of $5,000 to himself therefor. If the case had stopped with the vote of July 3, 1907, there would be force in that contention. But the case does not stop there. Since July 3, 1907, when the retroactive vote for an unearned salary was passed, Weld has continued to act as president, and has been enabled to do so solely by holding as trustee seventy-five out of the one hundred shares entitled to vote. And since this bill was filed by the plaintiff three days later, to wit, on July 6, 1907, she has done all she could to get back her control of the corporation and to get rid of Weld's taking on the management of the industrial end of the business and the payment to himself of an unearned salary of $5,000 a year. As we have said it is plain that Weld has prevented her from effecting those ends by his misuse of the control of a majority of the stock of the corporation given him as trustee for another purpose.

Further, it is plain that it is in his power at the annual election in the coming July to elect himself and his nominees directors, and thus for another year to secure for himself the presidency, the management of the industrial end of the business and the payment of an unearned salary of $5,000. That

will be for nine months after the term of the trust here in question runs out. Of Weld's disposition to exercise this power there can be no doubt, in the light of the past.

We are therefore of opinion that the plaintiff is entitled to have Weld removed from his office of trustee, for misuse of the control of the corporation. On his removal from the office of trustee the shares transferred to him as trustee should be assigned to the original owners. A decree to that effect may be entered.

*So ordered.*

*E. M. Brooks,* (*S. L. Whipple* with him,) for the plaintiff.
*H. Loewenberg,* for the defendants.